UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

02 MAY 13 PM 3 12

U.S. . . . . . . . . . .
N.D. OF ALABAMA

CLARENCE PAUL KELLEY,        )
                            )
        Plaintiff,           )
                            )
vs.                          )        Civil Action No. CV-01-S-1436-NE
                            )
HARSCO CORP.,                )
                            )
        Defendant.           )

ENTERED

MAY 1 3 2002

**MEMORANDUM OPINION**

Plaintiff, Clarence Kelley, is a former employee of Harsco Corporation, a company that

conducts business operations in Huntsville, Alabama under the name "Taylor-Wharton Gas and

Fluid Control Group of Harsco Corporation" ("Harsco"). Plaintiff began working for Harsco as a

material handler on May 11, 1998. During his employment, plaintiff contracted a severe infection

which eventually necessitated the surgical removal of his left eye on February 28, 2000. Seven days

prior to the surgery, plaintiff notified Harsco of his condition, and that he would need one week off

in order to recover. While recuperating from surgery, plaintiff received a letter from Harsco dated

March 13, 2000, informing him that his employment had been terminated effective February 25,

2000. Plaintiff then filed a charge with the Equal Employment Opportunity Commission, apparently

alleging that Harsco's termination of his employment was in violation of the Americans with

Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq*, and the Family and Medical Leave Act

of 1993 ("FMLA"), 28 U.S.C. § 2612 *et seq*.[1]

---

[1] This court used the phrase "apparently alleging" in text because plaintiff did not provide this court with a copy of his original EEOC charge. Neither party alleges the specific nature of plaintiff's EEOC charge; therefore, the exact nature of his EEOC charges is unknown to the court. Harsco initially argued in its answer (doc. no. 3) that plaintiff could not recover for claims he failed to raise in the EEOC charge, and that plaintiff's claims were barred by the applicable statute of limitations. Harsco did not raise or address either argument in its brief in support of summary judgment. Therefore, the court will consider those arguments abandoned. *Cf. Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255

Plaintiff filed the present *pro se* action on June 5, 2001, alleging that he suffers from a disability and/or a perceived disability (blindness in one eye) which substantially limits his ability to perform one or more basic life functions, and that Harsco failed to accommodate his disability and terminated his employment in violation of the ADA. Plaintiff further alleges that his employment was terminated while he was on medical leave in violation of the FMLA.

Harsco filed a motion for summary judgment on October 9, 2001 (doc. no. 7), which was denied October 12, 2001 (doc. no. 8). Harsco filed a renewed motion for summary judgment on January 18, 2002 (doc. no. 9). The court entered a Submission Order on January 22, 2002 (doc. no. 12), informing the parties that the renewed motion for summary judgment would be deemed submitted for decision on February 19, 2002. The Submission Order further directed plaintiff to file any evidentiary submissions in opposition to the motion for summary judgment by February 12, 2002, and any brief in opposition by February 19, 2002. Plaintiff did not comply with either directive. Indeed, other than his complaint, plaintiff has not filed any document with this court.

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct.

---

n.1 (11th Cir. 2001) ("Lucas has abandoned his unlawful harassment claim by not raising it in his initial brief on appeal.") (citing *Allison v. McGhan Medical Corp.*, 184 F. 3d 1300, 1317 n.17 (11th Cir. 1999)).

2548, 2553, 91 L.Ed.2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)) (internal quotation marks and citations omitted); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

As previously observed, plaintiff was given notice of the dates by which he should submit any materials in opposition to Harsco's renewed motion for summary judgment. *See* Submission Order (doc. no. 12). Therefore, it cannot be seriously contended that plaintiff was unaware of his burden under Federal Rule of Civil Procedure 56. Specifically, that burden requires that, when a motion for summary judgment is made and supported as provided by the Federal Rules of Civil Procedure, plaintiff, as the adverse party:

> may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552 (holding that summary judgment will be granted "after adequate time for discovery ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

3

In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him." *Ryan v. International Union of Operating Engineers, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986). There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. *See Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990). "Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

The court observes, however, that the standards for disposing of motions for summary judgment are more demanding when applied to the claims of a party who is not represented by counsel. Parties who appear *pro se* are afforded a leniency not granted to those who are represented by counsel. *Cf., e.g., Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972) (observing that, "however inartfully pleaded," the allegations of a *pro se* complaint filed by an inmate of a state penitentiary under 42 U.S.C. § 1983 are held to "less stringent standards than formal pleadings drafted by lawyers"); *Harmon v. Berry*, 728 F.2d 1407, 1409 (11th Cir. 1984) (same); *Woodall v. Foti*, 648 F.2d 268, 271 (5th Cir. 1981)[2] ("A *pro se* complaint, however inartfully drafted, must be held to less rigorous standards than the formal pleadings prepared by lawyers and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'") (quoting *Haines*).

Even so, the leniency accorded *pro se* litigants is not unqualified. As the Sixth Circuit has written:

> While courts must apply "less stringent standards" in determining whether *pro se*

---

[2]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

4

pleadings state a claim for which relief can be granted, *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976), *pro se plaintiffs are not automatically entitled to take every case to trial. As this court has noted, the lenient treatment generally accorded to pro se litigants has limits. Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir. 1991). *Where, for example, a pro se litigant fails to comply with an easily understood court-imposed deadline, there is no basis for treating that party more generously than a represented litigant. Id.*

*Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996) (emphasis added).  Moreover, a *pro se* plaintiff "must still meet the essential burden of establishing that there is a genuine issue as to a fact material to his case." *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997) (citing *Brown v. Crawford*, 906 F.2d 667, 669-70 (11th Cir. 1990)).

## I. SUMMARY OF FACTS

Harsco manufactures acetylene and high-pressure cylinders in its Huntsville facility.[3] Plaintiff began working in that facility as a contract employee on February 19, 1998.[4] Harsco offered him a full time position as material handler in the acetylene pre-finishing department on May 11, 1998.[5] Plaintiff accepted, and continued to work as a material handler until Harsco terminated his employment effective February 25, 2000.[6] During the tenure of plaintiff's employment, Harsco had in place an "Attendance and Absenteeism Policy" which applied to all of its employees.  That Policy provided:

> If you are going to be late or absent please make every effort to notify your supervisor either it [sic] advance or as soon as reasonably possible so that scheduling problems and uneven workloads on your fellow employees can be minimized.  Failure to notify your supervisor by the start of your scheduled shift may result in disciplinary action.

> There are three types of absences:

---

[3]Defendant's evidentiary submission (doc. no. 10), tab 2 (Traylor affidavit), ¶ 1.

[4]*Id.* ¶ 2.

[5]*Id.* ¶ 3.

[6]*Id.*, tab F.

Arranged:  When you obtain permission from your supervisor ahead of time to be away from your job (for example, medical or dental care, funeral, court appearance).

Excused:  When you are absent for a reason recognized as valid by your supervisor, such as personal illness or death in immediate family, and you have notified your supervisor as soon as you possibly could by phone or message. Failure to notify your supervisor by the start of your scheduled shift may result in an unexcused absence.

Unexcused:  Any absence that is not excused or arranged.

Three unexcused absences within any twelve month period will result in two days disciplinary suspension without pay.  Four unexcused absences will result in discharge.  Two instances of unexcused tardinesss within any twelve month period will count as one unexcused absence.

Any absence by an employee for three consecutive work days without notifying the Company will be considered a voluntary quit.[7]

Harsco notified plaintiff of its Attendance and Absenteeism Policy through the company's employee handbook, employee orientations, supervisor-led employee meetings, and employee roundtable meetings with Harsco's General Manager.[8]  Plaintiff, nevertheless, repeatedly violated the Attendance and Absenteeism Policy.

For example, plaintiff arrived late to work on February 17, March 10, March 26, and July 22, 1999.  Plaintiff did not arrange to be late to work on any of these occasions, nor did he call his supervisor, Robert White, in order to secure an excused absence.  White counseled plaintiff on July 26, 1999, and reminded him of the importance of arriving at work in a timely fashion.[9] Subsequently, plaintiff missed work entirely on July 29 and 30, 1999, without first arranging for time off, or notifying White prior to the start of his shift.  As a result, White issued plaintiff a verbal warning on August 2, 1999.  White recorded that warning in plaintiff's personnel file as follows:

---

[7]*Id.*, tab A.

[8]*Id.*, tab 2 (Traylor affidavit), ¶ 6.

[9]Defendant's evidentiary submission (doc. no. 10), tab B.

"This notice serves as a verbal [warning].  This will be followed by a written [warning], then suspension, then termination."  White also had plaintiff sign his name next to the notation to record the fact that he understood the verbal warning.[10]

Plaintiff's next unexcused absence occurred on September 13, 1999, which resulted in his being issued a written warning for violation of Harsco's Attendance and Absenteeism Policy on September 15, 1999.  At that time, White also warned plaintiff that one more unexcused absence would result in a two-day suspension without pay.[11]  Thereafter, plaintiff arrived to work late on October 11 and November 15, 1999.  Plaintiff accordingly was informed on November 15, 1999 that he was suspended from work on November 16 and 17, 1999.[12]  That notice of suspension also informed plaintiff that "another violation of Harsco's Attendance and Absenteeism Policy [will] result in immediate termination of [your] employment."[13]

In addition to its Attendance and Absenteeism Policy, Harsco also had a Vacation Policy which required vacation to be "scheduled in advance so supervisors would have adequate time to prepare for such absences and ... 'notice or after-the-fact vacation requests will not be approved.'"[14] Harsco altered its Vacation Policy on January 1, 2000, to allow for call-in vacation requests, *provided* telephone calls were made before the start of the employee's shift, *and*, were made directly to the employee's supervisor.  Voice mail requests were not permissible, and, if two employees were already out in a department, the call-in request would be denied.[15]  The Vacation Policy also

---

[10]*Id.*

[11]*Id.; see also id*, tab 2 (Traylor affidavit), ¶ 11.

[12]*Id.; see also id*, tab 2 (Traylor affidavit), ¶ 14.

[13]*Id.*, tab 2 (Traylor affidavit), ¶ 14.

[14]*Id.* ¶ 16 (emphasis in original).

[15]Defendant's evidentiary submission (doc. no. 10), tab 2 (Traylor affidavit), ¶ 19.

provided that any absence due to a call-in request for vacation that did not comply with Harsco's procedures would be deemed unexcused.[16]  Harsco alerted plaintiff to the new call-in vacation procedures during a departmental meeting conducted by White.[17]

Plaintiff attempted to utilize the call-in vacation procedures on February 14, 2000, by leaving a voice-mail message for White requesting vacation leave for that same day.[18]  His request was not approved, however, because he "failed to follow reporting procedures and because two employees were already out of the department on the day requested."[19]  Plaintiff returned to work on February 16, 2000, and White spoke with him, reiterating the proper call-in procedures.  White also reminded plaintiff that failing to follow the proper procedures would be deemed an unexcused absence.[20]

As previously noted, plaintiff contracted a severe infection during the period he was employed by Harsco which eventually necessitated the surgical removal of his left eye.  The surgical procedure occurred on February 28, 2000.  One week prior to that date (*i.e.*, on February 21, 2000), plaintiff first notified White of the impending surgery, *and*, that he would need one week off in order to recover from the surgery.[21]   Lynn Dingo, a representative of Harsco's Human Resources Department, then met with plaintiff, and explained the proper procedures for filing a request for FMLA leave.  Plaintiff was also given copies of Harsco's medical leave policy, a leave request form, a "certification of health care provider" form, a maintenance of benefits form, short-term disability

---

[16]*Id.* ¶ 20.

[17]*Id.* ¶ 22.

[18]*Id.* ¶ 23.

[19]*Id.* ¶ 24.

[20]*Id.* ¶ 25-26.

[21]Defendant's evidentiary submission (doc. no. 10), tab 2 (Traylor affidavit), ¶ 32; *see also* Complaint (doc. no. 1), ¶¶ 8-10.

paperwork, and written instructions as to the proper procedure for requesting FMLA leave.[22] Plaintiff did not complete any of the paperwork provided to him.[23]

A few days later, on February 24, 2000, plaintiff telephoned White, and left a voice-mail message requesting vacation for that same day. Plaintiff's request was not approved because he left a voice mail message, rather than making the request directly to his supervisor prior to the beginning of his shift.[24] Plaintiff also did report to work on February 25, 2000, the last day he worked before undergoing surgery. Moreover, he did not return to work on March 6, 2000, as he previously had indicated he would.[25] Plaintiff asserts that his doctor extended his recovery time through March 20, 2000,[26] but plaintiff did not inform Harsco of that fact.[27] In any event, when plaintiff did not return to work, on March 6, 2000, Loren Traylor, Manager of Harsco's Human Resources Department, made several unsuccessful attempts to contact him.[28] She then sent plaintiff a certified letter, dated March 13, 2000, stating:

> Since you have not been here to address this and I have been unable to reach you by phone, I am sending this letter to inform you that your employment is being terminated effective February 25, 2000 due to violation of our attendance policy for your absence on February 24.

After receiving Traylor's letter, plaintiff telephoned her on March 16, 2000. During that conversation, Traylor questioned plaintiff regarding his knowledge of the proper procedure for making call-in vacation requests. Plaintiff admitted that the was familiar with the proper procedure.

---

[22]*Id.* ¶¶ 33, 38.

[23]*Id.* ¶ 41.

[24]*Id.* ¶¶ 27-28.

[25]*Id.* ¶ 42.

[26]Complaint (doc. no. 1), 10.

[27]Defendant's evidentiary submission (doc. no. 10), tab 2 (Traylor affidavit), ¶ 42.

[28]*Id.* ¶ 44.

He also admitted that he was absent from work February 24, 2000, in order to complete errands for his parents. When Traylor asked him why he had not contacted anyone associated with Harsco since February 25, 2000, he responded that he "had not thought about it."[29]

Plaintiff filed the present action on June 5, 2001.

## II. DISCUSION

### A.    Plaintiff's Claims Under the ADA

Plaintiff alleges that Harsco failed to accommodate his disability, and terminated his employment, in violation of the Americans with Disabilities Act ("ADA"). An ADA plaintiff ultimately must prove that his employer intentionally discriminated against him because of his disability. "In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of an ADA violation through circumstantial evidence using the familiar burden-shifting analysis employed in Title VII employment discrimination cases." *Wascura v. City of South Miami,* 257 F.3d 1238, 1242 (11th Cir. 2001); *see also, e.g., Hilburn v. Murata Electronics North America, Inc.,* 181 F.3d 1220, 1226 (11th Cir. 1999) ("The familiar burden-shifting analysis of Title VII employment discrimination actions is equally applicable to ADA claims.") (citing *Moses v. American Nonwovens, Inc.,* 97 F.3d 446, 447 (11th Cir. 1996)); *DeLuca v. Winer Industries, Inc.,* 53 F.3d 793, 797 (7th Cir. 1995) (collecting cases). In order to establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate: (1) that he has a "disability" within the meaning of the Act; (2) that he is "a qualified individual with a disability," meaning that he can perform the essential functions of the employment position he holds or seeks, with or without

---

[29]*Id.* ¶¶ 46-48.

reasonable accommodation being made by the employer;[30] and (3) that he suffered an adverse employment action because of his disability.[31] *See, e.g., Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000); *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998); *Doe v. Dekalb County School District*, 145 F.3d 1441, 1445, 1454 (11th Cir. 1998); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citing *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996)).[32]

If a plaintiff demonstrates all three elements of a *prima facie* case, then the employer would be required to "'mak[e] reasonable accommodations to the known physical or mental limitations' of the individual to avoid entry of judgment against it. ... The employer may avoid making reasonable accommodations by 'demonstrat[ing] that the accommodation would impose an undue

---

[30]*See* 42 U.S.C. § 12111(8) (defining "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"); *see also* 29 C.F.R. § 1630.2(m) ("Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position").

[31]There actually is a fourth element, implicit in the interstice between the second and third: *i.e.*, "a plaintiff must demonstrate that the employer had either actual or constructive knowledge of the disability or considered the employee to be disabled." *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 910 (11th Cir. 1996) (citing *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996) (per curiam)).

[32]*See also, e.g., Pritchard v. Southern Company Services*, 92 F.3d 1130, 1132 (11th Cir.) ("In order to establish a prima facie case under the Americans with Disabilities Act of 1990, ... Pritchard must show that: 1) she has a disability, 2) she is a qualified individual, and 3) she was discriminated against because of the disability"), *amended on reh'g*, 102 F.3d 1118 (11th Cir. 1996), *cert. denied*, 520 U.S. 1274, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997). Other courts of appeals have made similar findings. *See, e.g., McKay v. Toyota Motor Manufacturing*, 110 F.3d 369 (6th Cir. 1997) ("A party seeking relief under the ADA for termination must establish (1) that she is a disabled person within the meaning of the Act, (2) that she is qualified to perform the essential functions of her job with or without reasonable accommodation, and (3) that she suffered an adverse employment decision because of her disability"); *Williams v. Channel Master Satellite Systems, Inc.*, 101 F.3d 346, 348 (4th Cir. 1996) ("To establish a cause of action under the ADA, a plaintiff must demonstrate: '(1) that [s]he has a disability; (2) that [s]he is otherwise qualified for the employment or benefit in question; and (3) that [s]he was excluded from the employment or benefit due to discrimination solely on the basis of the disability'").

hardship on the operation of the business of such covered entity.'" *Burch v. City of Nacogdoches*, 174 F.3d 615, 619 (5th Cir. 1999) (quoting 42 U.S.C. § 12112(b)(5)(A)[33]).

### 1.    Whether plaintiff is disabled

The ADA defines the concept of "disability" three ways — that is, as including any person: (A) who has a "physical or mental impairment" that "substantially limits" one or more of the "major life activities" of such person; or (B) who has a "record" of such an impairment; or (C) who is "regarded" as having such an impairment.  42 U.S.C. § 12102(2); *see also* 29 C.F.R. § 1630.2(g). "An individual is deemed to be 'disabled' for purposes of the ADA if he satisfies any one of these three enumerated definitions." *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 911 (11th Cir. 1996).

The ADA does not define those conditions constituting a "physical or mental impairment." Instead, that phrase, and many other significant terms in the Act, are only defined in regulations promulgated by the Equal Employment Opportunity Commission pursuant to authority delegated by Congress,[34] and, in the "Interpretive Guidance on Title I of the Americans With Disabilities Act" attached as an appendix to those regulations.[35]  Even though such regulations do not bind this court, they may be relied upon "for guidance." *Gordon*, 100 F.3d at 911.  The Supreme Court long has recognized that an agency's interpretation of a statute it is charged with enforcing should be given

---

[33]The "general rule" prescribed by the ADA is that: "No covered entity shall *discriminate* against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, or other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a) (emphasis supplied).  The term "discriminate" is defined in the succeeding subsection (b) as including, among other things, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A).

[34]*See* 42 U.S.C. § 12116 (requiring the EEOC to issue regulations to implement Title I of the ADA).

[35]*See* 29 C.F.R. § 1630.

"considerable weight," and should not be disturbed unless it appears from the statute or legislative history that Congress intended a different construction. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *see also, e.g., Griggs v. Duke Power Co.*, 401 U.S. 424, 433-34, 91 S.Ct. 849, 854-55, 28 L.Ed.2d 158 (1971) (administrative interpretations "entitled to great deference"). The *Chevron* standard is applied by the Eleventh Circuit in the context of ADA claims. *Harris v. H & W Contracting Co.*, 102 F.3d 516, 521 (11th Cir. 1996).

The EEOC's administrative interpretations of the ADA define the phrase "physical or mental impairment" as meaning:

> (1)  Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, *special sense organs*, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

> (2)  Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h) (emphasis supplied). An eye obviously is a "special sense organ[]," and the loss of an eye thus would constitute a "physical impairment."

"A physical impairment, standing alone, ... is not necessarily a disability as contemplated by the ADA. ... The ADA requires that the impairment *substantially limit* one or more of the individual's *major life activities*." *Gordon*, 100 F.3d at 911 (emphasis supplied) (citations omitted). The phrase "substantially limits" is not defined by the Act, but implementing regulations instruct that it means a person either is:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).  The EEOC further instructs that courts should consider the following factors when determining whether a physical impairment substantially limits a major life activity: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."  29 C.F.R. § 1630.2(j)(2).

"Major life activities" are defined by another regulation as including "functions such as caring for oneself, performing manual tasks, walking, *seeing*, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i) (emphasis supplied).

Plaintiff alleges in his complaint that the loss of his left eye qualifies as a physical impairment which substantially limits one of his major life activities — "seeing" — as compared to the sight of an average person.

### 2.      Whether plaintiff is a qualified individual with a disability

The term "a qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8); *see also* 29 C.F.R. § 1630.2(m).[36]  To satisfy the second element of a prima facie ADA case, therefore, a plaintiff must show

---

[36]29 C.F.R. § 1630.2(m) provides: "Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position. (See § 1630.3 for exceptions to this definition)."

14

either that he can perform the essential functions of his job without accommodation, or, failing that, show that he can perform the essential functions of his job with a reasonable accommodation.   ...   Thus, if [the plaintiff] is unable to perform an essential function of his ... job, even with an accommodation, he is, by definition, not a "qualified individual" and, therefore, not covered under the ADA.   ...   In other words, the ADA does not require [an employer] to eliminate an essential function of [the plaintiff's] job.

*Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000) (citations omitted).[37]

Plaintiff's complaint does not address whether he is qualified to perform the essential functions of his job, either with or without accommodation, but Harsco does not dispute that plaintiff is qualified to perform the essential functions of his job.

### 3.   Whether plaintiff suffered an adverse employment action because of his disability

Termination of employment obviously is an "adverse" employment action.  Even so, plaintiff has not offered any evidence, direct or circumstantial, tending to indicate that Harsco's decision to terminate his employment was based upon his disability.  Plaintiff says only that the decision "was made ... after [he] was out on medical leave as a result of a serious health condition."  Assuming for the sake of argument that the decision to terminate plaintiff while he was on medical leave is sufficient to establish a *prima facie* case of discrimination under the ADA, plaintiff must offer some evidence tending to indicate that Harsco's stated reason for terminating his employment — plaintiff's violation of Harsco's Attendance & Absenteeism and Vacation Policies — was mere pretext, and not the real reason for his termination.  Plaintiff failed to address Harsco's stated reasons.  Instead, by failing to submit anything in opposition to Harsco's motion for summary

---

[37]*See also Burch v. City of Nacogdoches*, 174 F.3d 615, 619 (5th Cir. 1999):

To avoid summary judgment, Burch needed to show that (1) he could perform the essential functions of the job in spite of his disability, or (2) that a reasonable accommodation of his disability would have enabled him to perform the essential functions of the job.

judgment, plaintiff implicitly relies on the assertions made in his complaint that "Defendant terminated Plaintiff while he was unable to work because of a serious health condition. Defendant's actions were discriminatory and taken against Plaintiff because of a disability or perceived disability."[38] A party opposing summary judgment, however, "may not rely on his pleadings to avoid judgment against him." *Ryan v. International Union of Operating Engineers, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986).

> Forbidding reliance upon pleadings precludes a party from "choos[ing] to wait until trial to develop claims or defenses relevant to the summary judgment motion." *Golden Oil Co., Inc. v. Exxon Co., U.S.A.*, 543 F.2d 548, 551 & n. 3 (5th Cir. 1976). This effectuates the purpose of summary judgment which "'is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Wouters v. Martin County*, 9 F.3d 924, 928 (11th Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)), *cert. denied*, 513 U.S. 812, 115 S.Ct. 65, 130 L.Ed.2d 21 (1994). Thus, "mere general allegations which do not reveal detailed and precise facts" will not prevent the award of summary judgment upon a court's determination that no genuine issue for trial exists. *Franz Chem. Corp. v. Phila. Quartz Co.*, 594 F.2d 146, 150 (5th Cir. 1979).

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995); *see also Irby v. Bittick*, 44 F.3d 949, (11th Cir. 1995) ("The non-moving party cannot rely solely on its pleadings, Fed.R.Civ.P. 56(e); it 'must do more than simply show that there is some *metaphysical doubt* as to the material facts.'") (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (emphasis added)). Accordingly, Harsco's motion for summary judgment as to plaintiff's claims under the ADA is due to be granted.

**B.    Plaintiff's Claims Under the FMLA**

Under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601-2654, an

---

[38]Complaint (doc. no. 1), ¶ 14.

Case 5:01-cv-01436-CLS    Document 14    Filed 05/13/02    Page 17 of 28

eligible employee[39] is entitled to up to twelve weeks of leave each year to care for a serious health condition of the employee, or the employee's child, spouse, or parent. *See* 29 U.S.C. § 2612(a)(1).[40] The FMLA further provides:

> any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave —
>
> (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or
>
> (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614(a)(1)(A)-(B). Such entitlements are limited by a subsequent section, providing that an eligible employee is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B).

To secure the availability of the foregoing entitlements, Congress declared it "unlawful for any employer to interfere with, restrain, or deny the exercise of[,] or the attempt to exercise, any right provided under this subchapter [of the FMLA]." 29 U.S.C. § 2615(a)(1). In addition, Congress declared it "unlawful for any employer to discharge or in any other manner discriminate against any

---

[39]An "eligible employee" is defined as "an employee who has been employed — (i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A).

[40]29 U.S.C. § 1612(a)(1) establishes an eligible employee's entitlement to leave as follows:

> Subject to section 2613 of this title, an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:
> (A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.
> (B) Because of the placement of a son or daughter with the employee for adoption or foster care.
> (C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter or parent has a serious health condition
> (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

17

individual for opposing any practice made unlawful by [the FMLA]," 29 U.S.C. § 2615(a)(2), *or because such individual*

> (1) has filed any charge, or has instituted or caused to be instituted any proceedings, under or related to [the FMLA];
>
> (2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under [the FMLA]; or
>
> (3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under [the FMLA].

29 U.S.C. § 2615(b); *see also* 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees ... who have used FMLA leave.").

Consistent with the foregoing statutory provisions, the caselaw interpreting the FMLA recognizes two types of claims for alleged violations of the Act: "*interference claims*, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act ... and *retaliation claims*, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act...." *Strickland v. Water Works and Sewer Board of the City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (emphasis added) (citations and footnote omitted). *Accord O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1352 (11th Cir. 2000). The elements of proof for each type of claim are different.

> To state *a claim of interference* with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied. *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1353-54 (11th Cir. 2000); *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999). In contrast, to succeed on *a retaliation claim*, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right. *King*, 166 F.3d at 891. In other words, a plaintiff bringing a retaliation claim faces the increased burden of showing that his employer's actions "were motivated by an impermissible retaliatory or discriminatory animus." *Id.* ...

18

When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, we apply the same burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for evaluating Title VII discrimination claim. *See Brungart v. BellSouth Telecomm. Inc.*, 231 F.3d 791, 798 (11th Cir. 2000). In order to state *a claim of retaliation*, an employee must allege that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the decision was causally related to the protected activity. *Parris v. Miami Herald Publ'g Co.*, 216 F.3d 1298, 1301 (11th Cir. 2000).

...

*Strickland*, 239 F.3d at 1206-07 (emphasis added); *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000); *Graham v. State Farm Mutual Insurance Co.*, 193 F.3d 1274, 1283 (11th Cir. 1999); *Dollar v. Shoney's, Inc.*, 981 F. Supp. 1417, 1419 (N.D. Ala. 1997); *Kaylor v. Fannin Regional Hospital, Inc.*, 946 F. Supp. 988, 999 (N.D. Ga. 1996); *Peters v. Community Action Committee, Inc.*, 977 F. Supp. 1428, 1435 (M.D. Ala. 1997). *Accord King v. Preferred Technical Group*, 166 F.3d 887, 892 (7th Cir. 1999).

In the present case, plaintiff's *pro se* complaint alleges only that he "was terminated on or about March 13, 2001 while out on medical leave, in violation of the FMLA, 28 U.S.C. § [2612], *et seq*." Plaintiff does not specify whether he seeks to assert an interference or retaliation claim. Therefore, the court will address whether plaintiff's complaint is sufficient to overcome a motion for summary judgment as to both.

### 1.    Interference claim

In order to maintain an interference claim under the FMLA, "a plaintiff need only demonstrate that he was entitled to [a substantive FMLA right] but denied the right. He does not have to allege that his employer intended to deny the right; the employer's motives are irrelevant." *Strickland*, 239 F.3d at 1208. In this case, plaintiff asserts that he was terminated while he was

allegedly on FMLA covered leave.  Harsco's termination of plaintiff's employment equates to a

refusal to restore him to his former position, thereby denying him a substantive FMLA right.  *See*

28 U.S.C. § 2612(a)(1)(D).

An employee's right to reinstatement upon the return to work from covered leave is not

absolute.

> An employer can deny the right to reinstatement, however, if it can demonstrate that
> it would have discharged the employee had he not been on FMLA leave.... In other
> words, if an employer can show that it refused to reinstate the employee for a reason
> wholly unrelated to the FMLA leave, the employer is not liable.

*Strickland*, 239 F.3d at 1208.

Harsco asserts that it terminated plaintiff's employment not because he took FMLA leave,

but because he had violated Harsco's Attendance and Absenteeism Policy which provides:

> If you are going to be late or absent please make every effort to notify your supervisor
> either it [sic] advance or as soon as reasonably possible so that scheduling problems
> and uneven workloads on your fellow employees can be minimized.  Failure to notify
> your supervisor by the start of your scheduled shift may result in disciplinary action.

> Three unexcused absences within any twelve month period will result in two days
> disciplinary suspension without pay.   Four unexcused absences will result in
> discharge.  Two instances of unexcused tardinesss within any twelve month period
> will count as one unexcused absence.

Harsco submitted excerpts of plaintiff's personnel file indicating that he was late to work on March

26, and July 22, 1999, in violation of Harsco's Attendance and Absenteeism Policy.  Then, on July

29, 1999, plaintiff was absent from work in violation of the Policy, because he did not arrange for

leave or notify his supervisor before the start of his shift.  After plaintiff returned to work, he was

given a verbal warning on August 2, 1999, notifying him that his absences were excessive, and that

future violations would result in a written notice, followed by a two day suspension, and ultimately

termination. Following the verbal warning, plaintiff was absent from work on September 13 and 14, 1999, which resulted in a September 16, 1999 written warning. White again advised plaintiff regarding reporting to work on time. Plaintiff did not heed this advice, and reported to work late on October 11 and November 15, 1999. As a result, plaintiff was suspended from work for two days, November 16 and 17, 2000. He was again cautioned that "[t]he next instance of an unexcused absence or two more tardies will result in termination."[41] Subsequently, plaintiff missed work on February 24, 2000, which constituted an unexcused absence under Harsco's policy. After attempts to contact plaintiff proved unsuccessful, Harsco notified plaintiff on March 13, 2000 that his employment was terminated due to the February 24, 2000 absence.

The facts regarding plaintiff's unexcused absences from work, and his late arrivals to work are undisputed. Plaintiff does not dispute the veracity of Harsco's stated reason for terminating his employment, nor is there anything in the record tending to contradict Harsco's stated reason. Accordingly, plaintiff has failed to demonstrate the existence of a genuine issue of material fact which would withstand Harsco's motion for summary judgment as to an interference claim under the FMLA.

### 2.    Retaliation Claim

In order to state a claim of retaliation under the FMLA,

a plaintiff must prove three elements at trial: (1) he availed himself of a protected right under the FMLA; (2) he suffered an adverse employment decision; and (3) there is a causal connection between the protected activity and the adverse employment decision.

*Parris v. Miami Herald Publishing Co.*, 216 F.3d 1298, 1301 (11th Cir. 2000) (citing *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000)).

---

[41]Defendant's evidentiary submission (doc. no. 10), tab D.

21

### a.   Whether plaintiff availed himself of a protected right under the FMLA

Plaintiff asserts that he notified Harsco "of his serious health condition and the necessity for leave prior to taking leave beginning February 28, 2000."[42]  Harsco acknowledges that plaintiff notified his supervisor on February 21, 2000 of his need to take leave under the FMLA.[43]  Neither plaintiff nor Harsco allege that plaintiff's need for leave was foreseeable and, thus, subject to the thirty day notice requirement set out under 29 U.S.C. § 2612(e)(2)(B), which provides that an employee:

> shall provide the employer with not less than 30 days' notice, before the date the leave is to begin, of the employee's intention to take leave under such subparagraph, except that if the date of the treatment requires leave to begin in less than 30 days, the employee shall provide such notice as is practicable.

While the FMLA does not address or provide notice guidelines in the case of unforseeable leave, 29 C.F.R. § 825.303 provides:

> (a) When the approximate timing of the need for leave is not foreseeable, an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case.  It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible.  In the case of a medical emergency requiring leave because of an employee's own serious health condition or to care for a family member with a serious health condition, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved.
>
> (b) The employee should provide notice to the employer either in person or by telephone, telegraph, facsimile ("fax") machine or other electronic means. Notice may be given by the employee's spokesperson (e.g., spouse, adult family member or other responsible party) if the employee is unable to do so personally. The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed.  The employer will be expected to obtain any

---

[42]Complaint (doc. no. 1) ¶ 13.

[43]Defendant's evidentiary submission (doc. no. 10), tab 2, ¶ 32.

additional required information through informal means.   The employee or spokesperson will be expected to provide more information when it can readily be accomplished as a practical matter, taking into consideration the exigencies of the situation.

29 C.F.R. § 825.303  Further, the Eleventh Circuit observed in *Strickland*:

The Code of Federal Regulations makes clear that an employee taking unforeseeable leave "need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed." 29 C.F.R. § 825.303(b). Once an employee taking unforeseeable leave informs his employer that potentially FMLA-qualifying leave is needed, the regulations place on the employer the burden of ascertaining whether the employee's absence actually qualifies for FMLA protection. *See id.* ("The employer will be expected to obtain any additional required information through informal means.")

*Strickland*, 239 F.3d at 1209.

In accordance with the foregoing regulations, once plaintiff gave verbal notice on February 21, 2000 that he needed FMLA leave to undergo surgery to remove his left eye, Harsco was charged with determining whether his requested leave qualifies as protected leave under the FMLA. Whether Harsco made such a finding does not appear in the record.  However, Harsco does not argue that plaintiff is not an eligible employee under the FMLA, or that his request for leave is not protected under the FMLA.  Further, as the Eleventh Circuit has observed, "[a]sking for medical leave is exercising or attempting to exercise a right under the statute, and being fired is a bad thing." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 798 (11th Cir. 2000).  Therefore, looking at the facts in the light most favorable to plaintiff, it appears that he did attempt to avail himself of a protected right under the FMLA.

### b.      Whether plaintiff suffered an adverse employment decision

Plaintiff asserts that he suffered an adverse employment decision because his employment was terminated while he was on leave under the FMLA. Termination is without question an adverse

23

employment action. *See Brungart*, 231 F.3d at 798.

### c.    Whether plaintiff can demonstrate a causal connection

When evaluating a claim of retaliation under the FMLA, in the absence of direct evidence of discrimination on the part of the employer, we apply the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for evaluating Title VII retaliatory discharge claims. *See Graham v. State Farm Mut. Ins. Co.,* 193 F.3d 1274, 1275, 1283 (11th Cir. 1999) (affirming based on the holding and rationale of the district court's order, which in turn applied the *McDonnell-Douglas* framework); *see also King v. Preferred Technical Group,* 166 F.3d 887, 891-92 (7th Cir. 1999) ("We find no reason to treat an intent-based FMLA claim ... any differently than other retaliatory discharge cases."); *Chaffin v. John H. Carter Co., Inc.,* 179 F.3d 316, 319 (5th Cir. 1999) (applying the *McDonnell Douglas* framework to evaluate claims that an employee was penalized for exercising rights protected by the FMLA in the absence of direct evidence of discrimination); *Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 160 (1st Cir. 1998) (same); *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997) (same).

...

...To establish the causal connection element, "a plaintiff need only show 'that the protected activity and the adverse action were not wholly unrelated.'" *Clover v. Total Sys. Servs., Inc.,* 176 F.3d 1346, 1354 (11th Cir. 1999) (quoting *Simmons v. Camden County Bd. of Educ.,* 757 F.2d 1187, 1189 (11th Cir. 1985)). In order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action. *See Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir. 1993); *Raney v. Vinson Guard Serv., Inc.,* 120 F.3d 1192, 1197 (11th Cir. 1997) ("[I]n a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression...."). That requirement rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him. As with most facts, the defendant's awareness can be established by circumstantial evidence. *See Goldsmith,* 996 F.2d at 1163.

*Brungart,* 231 F.3d at 798-99.

Temporal proximity between events, as the Supreme Court has observed, must be "very close." *Clark County School District v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 1511, 149

L.Ed.2d 509 (2001) (per curiam) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001), and citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997), and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992), for the proposition that three-month and four-month gaps, respectively, between an employer's knowledge of protected activity and an adverse employment action are not sufficiently close to serve as circumstantial evidence of a causal relationship between the two events).[44]

Even prior to the Supreme Court's decision in *Breeden*, the Eleventh Circuit had required that the interval between events be brief. In *Bass*, for example, the plaintiff began to suffer adverse employment actions within a matter of days after filing an EEOC charge on December 19, 1995:

> In December 1995, on his first day as a Training Instructor, Bass was assigned to clean out a warehouse — work ordinarily done by inmates supplied by the Department of Corrections. Between December 1995 and April 1996, Bass had no routine work assignment, performed custodial and clerical duties, and usually was supervised by personnel who were less senior than he. Middleton, who was in charge of the Training Instructors, and Chief Smith ordered Bass not to record on his work logs the custodial and clerical work he was performing.

*Bass*, 256 F.3d at 1101. The Eleventh Circuit found that "[t]he close temporal proximity between filing of the EEOC complaint and the adverse actions is sufficient in this case to satisfy the third prong of the prima facie case of retaliation." *Bass*, 256 F.3d at 1119. Moreover, in *Donnellon v. Fruehauf Corp.*, 794 F.2d 598 (11th Cir. 1986), a case in which "the defendant's witnesses never

---

[44]In full text, the Supreme Court's statement in *Breeden* is as follows:

The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close," *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (C.A.10 2001). *See e.g., Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (C.A.10 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (C.A.7 1992) (4-month period insufficient). Action taken (as here) 20 months later suggests, by itself, no causality at all.

*Clark County School District v. Breeden*, 532 U.S. 268,143, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001) (per curiam).

articulated clearly and consistently the reason that the plaintiff was discharged," the Eleventh Circuit nevertheless held that there was substantial evidence that the plaintiff was discharged in retaliation for filing a sex discrimination complaint, *including the fact that she was discharged less than one month after filing her complaint*.

In the present case, plaintiff was discharged less than one month after attempting to assert his rights under the FMLA, which tends to establish a close temporal proximity between the adverse employment decision — termination — and his attempt to avail himself of a protected right — leave under the FMLA. In order to successfully maintain a temporal proximity argument, however, plaintiff must demonstrate that the decision maker was aware that he had attempted to assert his rights under the FMLA. Plaintiff has not met that burden in this case. Plaintiff does not allege, and the record does not indicate, which individual or which committee members made the decision to terminate plaintiff's employment. Thus, there is no evidence before this court regarding the specific identity of the decision maker. The only evidence presented regarding the decision making process leading to plaintiff's termination is the letter of termination written by Loren Traylor, Harsco's human resources manager, and addressed to plaintiff. That letter, however, does not indicate whether Traylor actually made the ultimate decision to terminate plaintiff's employment, or was merely the messenger.

Because plaintiff has not provided the identity of the actual decision maker, he cannot demonstrate that the decision maker was aware, at the time the decision to terminate his employment was made, that plaintiff had attempted to exercise his rights under the FMLA. Demonstrating temporal proximity without demonstrating knowledge on the part of the decision maker is insufficient to show a causal connection between the adverse action and the protected activity.

### d.   Whether plaintiff can demonstrate pretext

Had plaintiff been able to successfully establish a *prima facie* case, his claim would fail nonetheless. Harsco maintains that plaintiff's employment was terminated not because he sought leave under the FMLA, but because he repeatedly violated Harsco's Attendance and Absenteeism Policy. Thus, Harsco has articulated a nondiscriminatory reason for its actions. Once a defendant has articulated a legitimate, nondiscriminatory reason for the challenged employment action, under the *McDonnell Douglass* burden-shifting framework, the burden shifts back to plaintiff to produce evidence sufficient to rebut the defendant's articulated reason. *See Sierminski v. Transouth Financial Corporation*, 216 F.3d 945, 950 (11th Cir. 2000) (citing *Olmsted v. Taco Bell*, 141 F.3d 1457, 1460 (11th Cir. 1998)). *See also, e.g., Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (noting that a plaintiff must put on enough evidence to permit a jury to reasonably "conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct'") (quoting *Cooper-Houston v. Southern Railway Company*, 37 F.3d 603, 605 (11th Cir. 1994)). Plaintiff carries the ultimate burden of showing that the defendant intentionally retaliated against him. *Cf. Wright v. Southland*, 187 F.3d 1287, 1292 (11th Cir. 1999) ("In sum, the plaintiff in an employment discrimination lawsuit always has the burden of demonstrating that, more probably than not, the employer took an adverse employment action against him on the basis of a protected personal characteristic.").

Plaintiff does not in any way attempt to rebut Harsco's articulated reason for terminating him. He does not deny that he was aware of Harsco's Attendance and Absenteeism Policy, or that he repeatedly violated that policy. There is nothing in the record tending to create a genuine issue of fact regarding Harsco's reason for terminating plaintiff's employment.

27

### III. CONCLUSION

For all of the foregoing reasons, defendant's motion for summary judgment is due to be granted.   A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

Done this   13th   day of May, 2002.

_____
United States District Judge